RICHARD B. LEAKE, TRUSTEE, vs. THOMAS L. WATSON
AND OTHERS.

New Haven and Fairfield Cos., Oct. T., 1890. ANDREWS, C. J., CARPEN-
TER, LOOMIS, SEYMOUR and TORRANCE, JS.

A testator, after making a definite provision for his widow in lieu of dower, which she accepted, gave the residue of his estate to trustees, who were to hold one fifth for each of his four daughters, who were to receive the income for life "and the remainder to go to their heirs forever;"

Leake v. Watson.

with a provision that each one might, if she deemed it expedient, from time to time receive portions of the principal, not exceeding in all one half of it, nor more than one thousand dollars in any one year; the remaining fifth to be held in trust for the children of the testator's deceased son. One of the daughters died before the testator. Held—

1. That the bequests to the daughters contained in each case a gift to the daughter of an equitable life use of a fifth of the trust fund, and a further and distinct gift of what should remain of this fifth of the trust property to her heirs.

2. That the word "heirs" was a word of purchase and not of limitation, and was to be taken in its ordinary sense, as meaning the persons who, at the death of each daughter, would take from her by descent.

3. That the estate therefore could not vest, under the gift over, until the death of the daughter, at which time the persons who would take the remainder might be neither persons in being at the death of the testator nor the children of such persons.

4. That the gift over was therefore void under the statute against perpetuities.

5. That the invalidity of the gift over did not invalidate the whole bequest, the two being severable.

6. That the property thus given in remainder became intestate estate.

7. That the widow, having accepted under the will a definite share of the estate in lieu of dower, was not entitled to any part of this intestate estate.

8. That the gift of one of the fifths in question in trust for the children of the deceased son, being in all respects legal, they retained what was so given and also took one fourth of the intestate estate.

9. That each of the three daughters took absolutely her fourth of the intestate estate and had also a life use of one third of the fourth which went to the children of the deceased son, these children taking their share of the intestate estate subject to the life use of the daughters in it.

10. That the amount which each daughter might take under the provision that she might receive one thousand dollars a year from the principal of the trust fund, not exceeding in all one half of it, was to be determined by the amount of the trust fund as it stood in the mind of the testator, and not by its amount as affected by the withdrawal of the intestate estate from it.

11. That where the amount thus drawn from the principal, in the case of one of the daughters, was equal to the whole of her fifth of the trust fund as reduced by the withdrawal of the intestate estate, but not exceeding one half of the original trust fund, she was to be regarded as having exhausted the share of the fund legally held in trust for her, and to be the absolute owner of what remained of her share of the estate.

The act of 1821 abolishing the rule in Shelley's case, (now Gen. Statutes, § 2953,) does not conflict with or in any way affect the act of 1784 against perpetuities, (Gen. Statutes, § 2952.)

Under the statute against perpetuities the words "immediate issue or de-

scendants " have by repeated decisions been determined to mean chil-
dren, and not grandchildren or other descendants more remote.

That statute applies equally to all gifts, whether of real or of personal es-
tate.

It is a fundamental rule in the construction of wills that a testator is always
presumed to use the words in which he expresses himself according to
their strict and primary acceptation, unless from the context it appears
that he has used them in a different sense.

The word "heirs" in its primary legal meaning expresses the relation of
persons to a deceased ancestor.

[Argued November 20th, 1890—decided June 1st, 1891.]

ACTION by a trustee to recover the value of certain stocks
and bonds claimed to belong to the trust estate ; brought to
the Superior Court in Fairfield County. Facts found and
the case reserved for advice. The case is fully stated in the
opinion.

· *C. R. Ingersoll* and *W. L. Bennett*, for the plaintiff.

*H. Stoddard* and *G. Stoddard*, for the defendant Watson.

*J. W. Alling*, for the defendants Mary E. Jennings and
Elizabeth W. Hyde, daughters of Charles Bulkley, and
Frederick B. Hyde and Charles B. Jennings, grandchildren.

TORRANCE, J. This is an action by the plaintiff as trus-
tee of certain estate for Georgianna Nichols, under the will
of her father, Charles Bulkley, against the defendant, to re-
cover the value of sundry stocks and bonds, alleged to belong
to the trust estate, and to have been received and sold by the
defendant as a broker, with knowledge that the same were
being sold and disposed of in violation of the trust.

Upon a former hearing before this court, on a reservation
made by the Superior Court, it was found that the claims of
the parties virtually called for the judicial construction of
the will of Charles Bulkley, and that the questions involved
could not properly be considered or determined without the
presence, as parties, of all persons interested in and under
the will. The case was therefore remanded to the Superior

Court, to give the defendants the opportunity to summon into the court, and make parties to the cause, all such interested parties, to the end that the measure of right in Mrs. Nichols to the shares set apart in trust for her, and all questions presented by the respective parties, might be finally determined in one proceeding. See the case of *Leake* v. *Watson*, 58 Conn., 332.

Thereupon in the Superior Court all persons interested in or under the will were made parties to this cause, and upon pleadings filed by them were heard by the court. The Superior Court made a supplemental finding, and, upon the facts found in the original and supplemental findings, reserved the case for the advice of this court.

Charles Bulkley died in October, 1875. At the date of the execution of his will, in April, 1875, there were living four children of the testator, to wit, Georgianna Nichols, Mary Elizabeth Jennings, Elizabeth Whitney Hyde, and Catherine Bulkley; also nine grandchildren, including three children of Charles H. Bulkley, a deceased son of the testator. Catherine Bulkley, one of the daughters, died before the testator. His other three children and his nine grandchildren survived him, and are all parties to this suit. Since his death three great grandchildren have been born.

One of the principal questions in the case as now presented, arises upon the construction of the fourth clause of Charles Bulkley's will, which reads as follows:—

" Fourth. All the rest, residue and remainder of my estate, real and personal, I give, devise and bequeath unto trustees, as hereinafter named, for the uses and purposes hereinafter set forth, as follows :

" One fifth to be held in trust, and the income, use, interest and improvement thereof to be paid over annually, or in more frequent installments, if deemed expedient and convenient by the trustees, unto and for the use and benefit of my daughter Mary Elizabeth, wife of Isaac Jennings ; the remainder to go to her heirs forever; provided that said Mary Elizabeth may, if she shall deem it expedient and necessary, from time to time take and receive portions of the

principal, not exceeding in all one-half of such principal, and not to exceed the sum of one thousand dollars in any one year; such portion of the principal to be paid over by the trustees upon notice in writing so to do, and the receipt of said Mary Elizabeth to be a sufficient voucher to the trustees in the premises.

"Three other parts, of one-fifth each, to be held in trust in the same manner as aforesaid, with the privilege of receiving portions of the principal, for the use and benefit respectively of my other daughters, Elizabeth Whitney, wife of Rev. Frederick S. Hyde, Georgianna, wife of William B. Nichols, and my aforementioned daughter Catherine, with remainder to their heirs forever.

"And I appoint as trustees to execute the trust aforesaid, my wife, Elizabeth Bulkley, and my nephew, Oliver Bulkley, and direct that they be not required to give bonds for the performance of their duties as such trustees.

"The remaining one-fifth of said residue I give, devise and bequeath unto my wife, Elizabeth Bulkley, and Francis D. Perry, of Fairfield, to hold in trust, to appropriate the use, income, interest and improvement thereof for the support, maintenance and education of Annie E. Bulkley, Erastus B. Bulkley and Grace E. Bulkley, children of my deceased son Charles H. Bulkley, in such manner as they, the said trustees, shall deem proper and expedient; and using so much of the principal as said trustees may find necessary to do during their minority, and to pay over unto each, at attaining majority, all, or so much as said trustees may deem fit, of the share then due such one arriving at majority; and upon arriving at majority of the youngest living of said children, to pay over unto each child, or its heirs if deceased, the principal sum, or so much thereof as shall not have been before expended, to hold to them respectively and their heirs forever."

Whether the "rest, residue and remainder" spoken of in this fourth clause, consisted, at the time of Charles Bulkley's death, wholly of personal estate, or partly of personal and partly of real estate, and if of both, what proportion was

real and what personal, does not perhaps clearly appear from the record. Presumably it consisted of both, for the clause in question speaks of "my estate, real or personal," and the sixth clause gives the executors power to dispose of any and all of the real estate, except that described in the second clause of the will. However this may be, the record shows that the estate actually distributed to the trustees under this fourth clause consisted wholly of personal estate.

An examination of this fourth clause of the will shows clearly two things :—first, that whatever disposition the testator intended to make of any one of the shares given in trust for the daughters, that same disposition he intended to make of all; and second, that the clause in question, in the case of each daughter, contains, in form at least, two gifts, namely, one of the equitable life use to the daughters, coupled with certain rights, powers or privileges to take part of the principal, and a further gift of what shall remain of the trust property to their heirs. The fourth clause as clearly in form contains these two gifts, as the second clause contains a gift to the wife of the life use of the homestead and a gift over to the children or their heirs.

The defendant claims, in substance, on this part of the case, that if the fourth clause does in fact contain two such distinct gifts, the gift of the remainder to the heirs is void, because it violates the provisions of our statute against perpetuities. The plaintiff, on the other hand, claims that the clause in question either does not contain two such distinct gifts, or, if it does, that the gift of the remainder over does not come within the prohibition of the statute.

The first question then is, whether the clause in question contains in fact, as well as in form, a separate and distinct gift of the remainder to the heirs of the daughters.

In support of his claims upon this point the plaintiff says, in substance, that in the sentence, " the remainder to go to her heirs forever," the word " heirs " is used as a word of limitation; that the testator intended to vest in Mrs. Nichols an equitable life estate, together with a remainder in fee,

which would descend to her heirs, and which she could not alien.

In short, the plaintiff claims that this clause is to be interpreted as giving the fee to Mrs. Nichols, without the power to dispose of it or to incumber it in any way to the prejudice of the heirs, to whom it would eventually go by descent and not by purchase.

The argument in support of this claim seems to be, that inasmuch as the remainder is to go to her heirs, the testator intended them to take such remainder in the character of heirs, and not as purchasers, and that to accomplish this their ancestor must take a fee, but without the power to dispose of it or incumber it.

The intent of the testator is to be ascertained from the language employed, and if the language here in question is given its natural and ordinary meaning, it is difficult to see how any such claimed effect can flow from it. In the first place, it should be remembered that the property actually held in trust was in fact personal property and not real estate. The will was made in April, 1875 ; the testator died in the fall of that year ; and the estate was distributed within six months after his decease. At the time of the distribution the estate, amounting to nearly three hundred thousand dollars, consisted almost entirely of stocks and bonds. It is quite reasonable to suppose that both at the time the will was drawn and at the decease of the testator, the estate consisted almost entirely of personal property. If so, it is difficult to believe that either the testator or the draughtsman had in mind the creation of estates in fee or in tail in this personal property.

In the next place, it is apparent that the will was drawn by one familiar with legal conceptions and legal terminology, and quite capable of expressing himself in language which admits of little or no dispute. When he uses the word " heirs " elsewhere as a word of limitation, he leaves no room for doubt that he intended so to use it. When he uses it as a word of purchase, it clearly appears that he intended so to use it. When he gives a life estate, as in the

second clause, he leaves no room for doubt as to the kind and nature of the estate given. In making the gift of the life use to the daughters and of the remainder to their heirs, the testator makes use of substantially the same language employed by him in the second clause to give a life use to his wife and a remainder to the children and their heirs. The fact that he thus uses substantially the same forms of expression in both cases, prompts the belief that he used them intentionally, and in order to effect the same purpose, namely, to give a life estate to one person and the remainder to others as purchasers.

If the testator, in the fourth clause, intended to create and vest in his daughters some kind of an estate in fee or in tail, which the daughters could neither incumber nor dispose of in any way to the prejudice of their heirs, it is but natural to suppose that he would have used different language from that employed in the second clause. In the second clause of the will the word " remainder " seems to be used in the technical sense of the term, while in the fourth clause it can hardly be said to be so used. By the word " remainder " in the fourth clause the testator seems to mean what shall be left of the personal property, (of which he must have known the trust fund would largely if not wholly consist,) after the decease of the daughters. The language used is apt and fit to convey a life estate to the daughters, and also to convey by will to others designated as her heirs, such a remainder after the death of the daughters. It is not apt and fit to create and vest in the daughters an estate of the kind and nature claimed by the plaintiff.

On the whole then, to construe these devises to the daughters and their heirs as the plaintiff here claims, is, we think, to do violence to the language used, and to derive from it an intent which cannot be derived therefrom if that language is to bear its ordinary and natural meaning.

There is nothing in the other parts of the will that favors the plaintiff's claim, and we know of no rules of construction which require us to put such an interpretation upon the language of this will as the plaintiff here contends for. We

therefore think that this fourth clause of the will contains in fact, as well as in form, a devise to Mrs. Nichols of an equitable life estate in the trust property, and also a distinct, substantive gift to other persons designated as her heirs, of something which she was in no event to take, namely, that which should remain of the property after her death.

The next question is, whether this devise to the heirs comes within the prohibition of our statute against perpetuities. That statute reads as follows :—" No estate in fee simple, fee tail or any less estate, shall be given by deed or will to any persons but such as are, at the time of the delivery of such deed or death of the testator, in being, or to their immediate issue or descendants ; and every estate given in fee tail shall be an absolute estate in fee simple in the issue of the first donee in tail." Gen. Statutes, § 2952.

The solution of this question depends chiefly upon the meaning of the word "heirs" as used in the sentence, "the remainder to go to her heirs forever." If it means the immediate issue or descendants of persons in being at the death of the testator, within the meaning of the statute, then the gift over is valid. If it means any and all persons who can inherit from them or who can take their estate under the statute of distribution, then the defendant claims that the gift over is void. In what sense then is the word "heirs" used in the sentence quoted?

As we have already said, it is not here used as a word of limitation. It is used to designate the persons who are to take, under the will, what remains of the trust property after the death of the daughters. When the word "heirs" is used in a will to point out legatees or devisees, the primary legal meaning of the word will be given to it, unless the context shows clearly that the testator used it in a different sense ; and in its primary meaning when thus used it expresses the relation of persons to a deceased ancestor. *Cushman* v. *Horton*, 59 N. York, 149; *Gold* v. *Judson*, 21 Conn., 616; *Rand* v. *Butler*, 48 id., 293; *Haley* v. *City of Boston*, 108 Mass., 579; *Fabens* v. *Fabens*, 141 id., 399; *Millett* v. *Ford*, 109 Ind., 159. This rule was followed also in the cases of *Alfred* v.

*Marks*, 49 Conn., 473, and of *Anthony* v. *Anthony*, 55 Conn., 256.

As before stated, this will is drawn by one who seems to be quite familiar with technical legal terms, and their legal signification. In the first clause of the will the phrase is, "said property is to go to my children or their heirs *per stirpes*." In the third clause the testator gives to his wife one third part of the residue of his estate " to her and her heirs forever." In the fourth clause, in the gift to the children of his deceased son, when the trust estate is paid over to them at majority, it is to be paid over "unto each child, or its heirs if deceased," and is to be held by them " and their heirs forever." In all of these instances the context shows quite clearly whether the word " heirs " is used as a word of limitation or of purchase, and, if of purchase, whether it means heirs generally or only children or immediate issue.

But in the fourth clause, where the devise is made to the heirs of the daughters, the word " heirs " stands alone and unqualified, as a description of the persons who are to take the remainder. In using the word " heirs " here, did the testator mean to exclude the issue of persons unborn at his decease, who might be alive at the death of a daughter, and would be her " heirs " in the legal sense of the term? He has not expressly said so. On the contrary he uses a word which includes such issue, lineal or collateral.

The sense in which the word " heirs ' is here used must be ascertained from the language of the will, and taking the will as, a whole. But, upon examination, it is quite evident that there is nothing in the context or other parts of the will that favors the view that he meant the children or immediate issue of a daughter. The fact that when he uses the word " heirs " elsewhere in the will as a word of limitation, or as meaning children or immediate issue, he leaves little or no doubt as to the sense in which he uses it, favors the view that, in the case of his daughters, the word " heirs " is to have its primary and ordinary meaning.

We are not at liberty to guess what he means; we must

Leake *v.* Watson.

ascertain his intent, if it can be ascertained at all, from the language he uses. One of the fundamental rules in the construction of wills is that a testator is always presumed to use the words in which he expresses himself according to their strict and primary acceptation, unless from the context of the will it appears that he has used them in a different sense. As we have seen in this case, it not only does not appear from the context that the testator, in the gift to the heirs of his daughters, used the word " heirs " in other than its strict primary meaning, but, on the contrary, the context rather forces us to hold that he did so use it here.

On the whole, looking at the entire will and reading it in the light of the accepted rules of construction and interpretation, we think the word " heirs " in this gift over, in case of the daughters, means the person or persons who, at the death of each daughter, answer the description of heirs in the legal sense; that is, those who would take by descent or by distribution from each deceased daughter.

If this be so, then it is obvious that the estate so given does not and cannot vest in any person or persons until the event of each daughter's death, because until then her " heirs " cannot be ascertained; and also that the person or persons who will take the remainder of the estate held in trust, may be neither persons who were in being at the death of the testator nor the children of such persons.

The child or children of one of the three great grandchildren, born since the death of the testator, may by possibility be the heir or heirs of Mrs. Nichols. Would a gift by will to such a child or children, who should be living at the death of Mrs. Nichols, be a void or valid gift under our statute against perpetuities?

The answer to this question depends upon the meaning of the words "immediate issue or descendants," as used in the statute. If these words include only the " children " of persons in being at the death of the testator, then clearly the gift would be void; but if they also include the issue or children of persons not in being at the death of the testator, but living at the death of Mrs. Nichols, then such a gift

would be valid. If the question as to the meaning of these
words were an open one, arguments founded upon the object
and purpose of the statute, upon the language employed to
effect that purpose, and upon a general course of reasoning,
would be entirely proper and admissible. But this is not the
case. The question as to the meaning of these words is no
longer open for discussion. This statute has been in exist-
ence for more than one hundred years, and cases involving
the meaning of the words in question have been frequently
before this court. In every such case wherein the present
question has been discussed, so far as we are aware, this
court has uniformly held that these words mean the children
of some person in being, and not his grandchildren or other
descendants not immediate.

If repeated decisions of a court of last resort can settle any
question relating to the construction of a statute as ancient
and important as the one now under consideration, then the
meaning of the words " immediate issue or descendants " in
this statute must be regarded as finally settled. It is true
our earlier reports do not contain many cases wherein the
present question is considered, but in the later cases the
question has been ably argued by counsel and fully and fairly
considered by the court. What construction the court and
the profession put upon these words at a comparatively early
period, may be seen from the opinions in the case of *Allyn* v.
*Mather*, 9 Conn., 114. In that case HOSMER, J., says:—
" That an estate for life in the plaintiff * * * contravenes
no rule of law is indisputable. He is the immediate issue
and descendant of a person in being at the time the will was
made, and hence is capable of taking the estate as a pur-
chaser. This construction however would defeat the testa-
tor's general intent, * * * for the son of Richard, on the
established principle of law, as well as by our statute, being
the issue of unborn issue, cannot take the estate otherwise
than by descent."

In the same case DAGGETT, J., in a dissenting opinion
upon another part of the case, agrees with the majority of the
court upon this point. He says:—" By our statute (which

however is only in affirmance of our common law), it is provided that no estate shall be given by will to any persons but to such as are in being, or to the *immediate* issue of such as are in being, at the time of making the will. This was the common law of Connecticut when the testator died ; and it is obvious, therefore, that no persons can take as purchasers after the issue of the grandson, Samuel Allyn. The issue of this grandson can take directly and by way of purchase, because they are the immediate descendants of a person in being at the making of the will; but with them the capacity of taking by purchase terminates."

Here it will be observed that both Judge HOSMER and Judge DAGGETT speak of our statute as affecting the capacity of parties to take under a will. If they are the issue of unborn issue, they cannot take. In this respect our statute differs from some other statutes and rules against remoteness.

So far as we know, no other case involving a discussion of the provisions of this statute came before this court until the case of *Jocelyn* v. *Nott,* in the 44th Conn., in 1876. The court in that case put the same construction upon the statute as had been put upon it in the case of *Allyn* v. *Mather,* by Judges HOSMER and DAGGETT.

Since that time cases involving the application or construction of the provisions of this statute have been quite frequently before the court, and it is unnecessary to do more than refer to them. The point in question was directly involved in the following cases:—*Rand* v. *Butler,* 48 Conn., 293 ; *Alfred* v. *Marks,* 49 id., 473 ; *Wheeler* v. *Fellowes,* 52 id., 238 ; *Andrews* v. *Rice,* 53 id., 566 ; *Anthony* v. *Anthony,* 55 Conn., 256.

The provisions of the statute were also considered and discussed to some extent in *Tappan's Appeal from Probate,* 52 Conn., 420, and in *Farnam* v. *Farnam,* 53 id., 261, and in both cases the judges seem to have been agreed upon the point here in question. We have been unable to find any case in our reports wherein this question has been decided otherwise, though doubtless cases may be found in which a

gift may have been obnoxious to the statute if the point had been made.

It is strenuously claimed, however, that this view of the law is in conflict with the provisions of section 2953 of the General Statutes. That section first appeared on the statute book in 1821, and reads as follows :—" All grants or devises of an estate in lands to any person for life, and then to his heirs, shall be only an estate for life in the grantee or devisee." The statute against perpetuities first appeared on the statute book in 1784. It is claimed that the later statute requires us to assume that the devise of which it declares the legal effect is a valid one ; that either it recognizes such a devise as not in conflict with the statute against perpetuities, or it means that, if there is any conflict, the old statute shall yield to the new.

The statute of 1821 was passed for a specific purpose, namely, to abolish what was known as the " Rule in Shelley's case." Under the operation of that rule the question of remoteness in the gift of the remainder over to the heirs could seldom arise, for the word " heirs " was rigorously held to be a word of limitation and not of purchase. This in most cases defeated the intention of the giver, and the statute was passed to remedy this evil. It assuredly was not passed to enable remote grantees or devisees to take an estate by purchase in cases where a gift to them would be void under the statute of 1784.

There is no conflict, real or apparent, between the two statutes. The one embodies in statutory form an old and important rule of public policy ; the other spent its force in abrogating a harsh, technical and arbitrary rule of common law. The mere fact that the statute speaks of grants or devises to the heirs of the grantee or devisee for life, is of little or no weight. It means such grants or devises when they are not obnoxious to the statute against perpetuities. That there may be such gifts, in form at least, is certainly true. A devise to A for life, and then a gift of the remainder to his heirs in fee, is good to-day, if by heirs the testator means the children of A. It was in such cases that the

"Rule in Shelley's case" was frequently applied, contrary to the true intent of the testator. In speaking of the case of *Bishop* v. *Selleck*, 1 Day, 299, Judge SWIFT says that the testator in using the word "heirs" manifestly meant children, yet the operation of the "Rule in Shelley's case" changed the devisees' life estate into an estate in fee. 1 Swift's Digest, 82. Neither the statute nor the rule it abolished had the slightest reference to the statute against perpetuities.

In view then of the purpose for which the statute of 1821 was enacted, we think it would be a very strained construction of it to hold that, either expressly or impliedly, it modifies, changes, or in any way affects the statute against perpetuities.

But even if we were dissatisfied with the construction thus uniformly and for so long a period put upon this statute of 1784, we should feel bound to follow the precedents unless very cogent reasons were shown for a departure therefrom. No such reasons have been shown in this case, and we think the construction put upon the statute is a natural and reasonable one.

By the decisions of this court, also, it has been determined that the provisions of the statute apply to devises, bequests and legacies equally; that is, to all gifts made by will, whether the property attempted to be given bo real estate or personal property, or both together. *Alfred* v. *Marks*, 49 Conn., 473; *Anthony* v. *Anthony*, 55 id., 256.

In the case at bar, as we have seen, the issue of unborn issue may be the heir or heirs of Mrs. Nichols at the time of her decease. That such a possibility makes the gift over to the heirs of Mrs. Nichols obnoxious to the statute, has also been determined by this court beyond all question. *Jocelyn* v. *Nott*, 44 Conn., 59; *Rand* v. *Butler*, 48 id., 293; *Alfred* v. *Marks*, 49 id., 476; *Wheeler* v. *Fellowes*, 52 id., 244.

The decisions of our own court have thus, in a series of cases involving substantially the points now in question in the case at bar, settled them in favor of the defendant's claim, and render further discussion unnecessary. We hold, there-

fore, that the gift or devise of the remainder over to the heirs of the daughters is void.

The next question is, what becomes of such remainder? That remainder, as we have seen, and at least so far as the present defendant is concerned, consists entirely of personal property. The rule, as settled by this court in such cases, is that where, as in the present case, the gift over is void, and there is no other disposition made of it in the will, the property so attempted to be given is intestate estate. _Jocelyn_ v. _Nott_, 44 Conn., 55 ; _Adye_ v. _Smith_, id., 60 ; _Rand_ v. _Butler_, 48 id., 293 ; _Bristol_ v. _Bristol_, 53 id., 242.

This leads us to consider what provisions of the will are in any way affected by this failure of the remainder over to the heirs of the daughters. So far as we can see, the provisions made in the second and third clauses of the will for the wife of the testator, are in no way affected by the failure of these remainders to the heirs of the daughters. These provisions undoubtedly gave to the widow more than she would have obtained by way of dower, and as one of the distributees, and were made in lieu of dower. She accepted them and has enjoyed the benefits of them since 1876. It was plainly not the intention of the testator that she should have any other share in his estate, for he evidently did not contemplate that any part of it would become intestate estate. When she accepted the offer in the will, she parted with her vested right to dower, and took instead the testamentary compensation by virtue of a contract then made. _Security Co._ v. _Bryant_, 52 Conn., 311. Under these circumstances, we think the widow is not entitled to any share of the intestate estate resulting from the failure of the remainders over to the heirs of the daughters. Indeed she does not make any such claim here, nor did she claim or receive any portion of the property of the testator, which became intestate by the death of Catherine Bulkley before the testator and was distributed in 1876. This one fifth of the residue which was given in trust for Catherine Bulkley, with remainder to her heirs, was treated by all concerned as

intestate property, and distributed as such. This part of the testator's property may therefore be laid out of the case.

The one fifth part of the residue given to the widow and Mr. Perry, in trust for the children of Charles H. Bulkley, the deceased son of the testator, is obviously not affected in any way by the fact that the remainders over to the heirs of the daughters are void, but remains as a valid disposition of that part of the estate.

So far as we can see, the only provisions of the will in any way affected by the failure of these remainders, are those in the fourth clause of the will, providing trust estates for the benefit of the three living daughters.

Before considering to what extent, if any, these provisions are affected by the failure of the remainders over, it will be well to notice certain facts as they appear of record. The record shows that in 1876 there was distributed and set apart to the trustees of each of the three living daughters, the sum of $44,981.81, to be held in trust for each of them under this fourth clause. At that time all of the parties in interest who were of full age joined with the guardians of those who were not, in a writing under seal, accepting and approving of such distribution, which writing was accepted by the court of probate and recorded on its records. Since that time the fund so set apart for each daughter's life use has been kept separate and distinct for such purpose. It is necessary also to bear in mind that the actual intent of the testator, so far as it can be known from the language used, was undoubtedly that each daughter should at all events have the income for life of the trust fund, and also the right to take, at the rate of one thousand dollars in each year, one half of the principal. This is his main, leading intent with respect to the daughters, and the gift over to their heirs of what should remain after the death of each, was undoubtedly of secondary importance in the mind of the testator.

It is also manifest that the testator actually intended that Mrs. Nichols and her heirs should have the sole benefit of the one fifth set apart for her and them, and that the children of the deceased son should have no part of that. He gave

those grandchildren by the will what was equivalent to the share given to each daughter and her heirs, and did not perhaps even contemplate that they would ever receive any other portion of his estate. But this last intent, on account of the statute, is invalid, and cannot be carried out as a whole. Part of his estate is intestate, and the grandchildren will take their share of it under the law. What then is their share? The answer to this depends upon the validity and effect of the provisions made in favor of the daughters.

If we hold that the provisions of the fourth clause for the benefit of the three living daughters must wholly fall with the fall of the remainders over, then of course there would be no trust fund; the entire fund distributed to the trustees of each daughter would be estate absolutely intestate; one quarter of it would, under the statute of distributions, belong to each daughter, and one quarter of it to the children of the deceased son. Or we might say that in the above contingency each daughter would take, under the statute, three quarters of the share set apart to her trustee for her use, and the children of her deceased brother would take the other quarter. So far as the present case is concerned it makes no difference in fact which of the above views of the matter we take; that is, it is all the same in the present case whether we regard each daughter as taking three quarters of the fifth set apart to her trustees, and the brother's children as taking one quarter of that, or each daughter as taking one quarter of the three fifths and the grandchildren the other quarter. Perhaps however, for the sake of clearness, it will be better to consider the matter in question as if the rights of Mrs. Nichols and the grandchildren were alone concerned. How then are the provisions of the will in favor of Mrs. Nichols affected by this failure of the remainder over to her heirs?

A question somewhat similar to this was considered in the case of *Andrews* v. *Rice*, 53 Conn., 566, where this court said:—" In answering that question we must ascertain the intention of the testator as to the object of those trusts, and whether that object is so independent of and severable from the illegal object that it can be carried into effect, with due

regard to the legal rights of all the parties interested, without annulling any of the legal provisions of the will and without adding thereto. If the leading and primary object was to accumulate a fund for illegal distribution; or if the trusts were strictly subservient or auxiliary to such an illegal distribution, so as to be themselves tainted with illegality; or if they are so connected therewith that they cannot be separated and carried into effect without involving consequences substantially and materially different from what the testator intended, they too must fall with the illegal distribution."

In the will here in question, one of the leading purposes of the testator was to provide for Mrs. Nichols an income for life. To this end he gives her the life use of one entire fifth of the residue of his estate. Not content with this, and apparently upon the supposition that such income would or might be insufficient, he gives her the right to take, in sums of one thousand dollars per year, the principal of the trust fund, to the extent of one half thereof. We cannot see that this purpose of the testator to provide Mrs. Nichols with a source of income for life is so connected with the remainder over, that if the latter fails the former cannot be carried out. The two are quite distinct and severable.

Nor do we see that these provisions in favor of Mrs. Nichols are so inconsistent with the legal rights of other parties that they cannot be carried out with due regard to those rights; nor that, if carried out now, they involve consequences substantially or materially different from the testator's legal intent; nor that in carrying them out we are adding to or annulling any of the legal provisions of the will. If the testator had made these provisions in favor of Mrs. Nichols, and there left the matter, without making in fact or attempting to make any disposition of the remainder over, there could, we think, be no doubt that these provisions would be valid. If Mrs. Nichols were the sole distributee of the testator, such a provision in her favor would be perhaps inoperative in fact, because of the superior rights she would obtain under the statute, but the provisions themselves would be

valid provisions. Mrs. Nichols however is not the sole distributee of the remainder of the fifth set apart for her use. The children of her deceased brother are entitled to one quarter thereof, subject to the rights of Mrs. Nichols. What then are those rights?

At the time of the distribution of the one fifth of the residue to her trustees, Mrs. Nichols, under the statute of distributions, was, as against the grandchildren, entitled to three quarters of such fifth absolutely. This three quarters part could not be held in trust after a demand made to convey to her, nor would the provisions of the will have any application to that part, because her rights as distributee were superior to and inconsistent with her rights under the will, and ordinarily, when such rights meet in one person, the lesser merge in the greater.

This would not apply to the remaining quarter however. As to that, whatever rights she has she obtains under the will. We think, under the will, she is clearly entitled to the equitable life use of this remaining quarter, and that the grandchildren take it subject to that right. But under the will she is also given the right to take one half of the principal of the trust fund in sums of one thousand dollars in each year. This is a right as important and valuable as that of the life use. Here is a clearly expressed intention that Mrs. Nichols may take, if she lives so long, in sums of one thousand dollars each year, a sum equal to one half of the trust property set apart to her trustees. We think the right so given to her was, in effect, the gift of a sum equal to the half of the trust fund set apart for her life use, as it existed at the death of the testator, to be taken in sums of one thousand dollars each year, if she lived long enough to take it. She was to have this if she deemed it expedient and necessary to take it, in addition to the life use of the entire fund. It turns out, however, that under the statute of distributions she is entitled to three quarters of this fund absolutely, and as her rights to this part, under the statute, are superior to and inconsistent with her rights under the

will, the rights given to her under the will can, as to this part, have practically no operation.

If the right here in question is to operate at all, it can operate only on the one fourth part of the fund which goes to the children of her deceased brother subject to her life use. We see no valid reason why such right may not be exercised upon that portion. Suppose she took one half of this fifth under the statute, and the children of the deceased brother took the other half; clearly in that case the children would take their half subject to her life use, and also subject to her right to take the entire principal of their half under the will. For, under the construction we have put upon the will, the testator has given the life use of the entire fund to Mrs. Nichols, with the power to take, under the will, a sum equal to one half of the entire fund, if she lives long enough to do so, and has legally said nothing about the disposition of the remainder. This is a valuable and valid gift. She has this right in addition to and independent of the rights she acquires to the fund as distributee, and whatever rights the children have as distributees to the portion of the estate we are now considering, they take them subject to the rights of Mrs. Nichols under the will. And all this is equally true where Mrs. Nichols takes, as here, three quarters instead of one half.

We therefore hold that, as between Mrs. Nichols and the children of her deceased brother, at the time of the distribution in 1876, Mrs. Nichols took three quarters of the trust fund set apart for her use absolutely; that she took the equitable life use of the remaining quarter; and the right to take, under the terms of the will, the principal of that remaining quarter, in sums not to exceed one thousand dollars in any one year, until she had received such a sum as would equal one half of the entire trust fund, as it then was, if she lived long enough to do so, or until the principal of that quarter was exhausted.

The record shows that the widow of the testator and Oliver Bulkley were the trustees of Mrs. Nichols. They together, or rather Oliver Bulkley as acting trustee, managed

the trust fund for Mrs. Nichols down to August, 1885, when he resigned and the widow was appointed sole trustee. Up to this time Mrs. Nichols had taken and received, under the will, in ten consecutive years, the sum of ten thousand dollars of the principal. This was very nearly one fourth of the entire trust fund distributed to her trustees. In August, 1885, it appears that, on account of these payments and some losses sustained, the balance of the principal of the trust fund remaining in the hands of the widow, as sole trustee for Mrs. Nichols, was $28,745.58. This was less than three quarters of the entire fund distributed to her trustees in 1876. It was after this time that the defendant, Mrs. Nichols, and her mother, the trustee, first began to have the dealings in question in this case. Such dealings resulted, as the record finds, in the loss of the entire balance of the trust fund, claimed by the plaintiff to amount to over $35,000. After this, in November, 1887, the mother of Mrs. Nichols was removed from the position of sole trustee for her daughter, and the plaintiff, who is the husband of one of the daughters of Mrs. Nichols, was appointed sole trustee in her place. Immediately after his appointment the plaintiff, as such trustee, made demand of the defendant for all the trust property which it was claimed the defendant had received from Mrs. Nichols and her mother, the sole trustee.

Certain facts are found upon the record, and certain questions arising thereon have been made and argued before us, regarding the notice which the defendant had that he was dealing with trust property, which was being sold and disposed of in violation of the trust, and regarding the disposition of part of the property to Mrs. Nichols, and other questions. In the view we have taken of the case it becomes unnecessary to consider or decide any of these questions.

The result we have arrived at shows that Mrs. Nichols had the absolute right to three quarters of the fund set apart for her use; that she had the equitable life use of the remaining quarter; and that she had the right to appropriate to herself in sums of one thousand dollars each year the entire principal of the remaining fourth, if she lived long enough to do so.

She had already taken ten thousand dollars before she began to deal with the defendant. Since then she has lived long enough to take, and has in fact and in effect, by her dealings with the fund, and with the consent of the trustee, her mother, taken the balance of the fourth part, so far as this defendant is concerned. As distributee of her father, and under his will, Mrs..Nichols clearly had the right to do what she did with this claimed trust fund, so far as the present case and this defendant are concerned.

Upon the facts found, as to the dealings between the defendant and Mrs. Nichols and her then trustee, we think the defendant is subrogated to all the rights which Mrs. Nichols had or has to the estate which so came into his hands. It is true in point of fact, and regarding the matter from one of the points of view before suggested, that Mrs. Nichols and her sisters are entitled, as distributees, to one quarter each of the entire fund distributed or set apart in 1876 to the trustees for them and each of them, and the children of the deceased brother to the other quarter. But this makes no difference in fact and effect in the result to which we have come.

Viewed from this standpoint, Mrs. Nichols has, under the will, exhausted her share of the principal of the fourth which would go to the children, and has in fact had and spent the fourth to which she was entitled absolutely as distributee. Under these circumstances, in any future distribution which may be necessary, or which may be made of any part of the fund now held in trust for the other two daughters, the share that Mrs. Nichols might be entitled to would be offset by the amount which she has already had, and that alone would be distributed, or rather allowed, to her as her share ; the balance would be distributed to the other sisters. And if at the death of them or either of them, they shall not have taken, under the will, at the rate of one thousand dollars per year, that part of the remaining fourth which goes to their brother's children subject to their rights under the will, then such part as so remains will be distributed to said children. The result is the same from either point of view.

Although technically then the plaintiff, as trustee, might be entitled to hold, as such, some part of the funds which came into the hands of the defendant, yet he would be so entitled only until demand was made upon him by Mrs. Nichols, or by the defendant in her right, to transfer to her or him the trust property discharged of the trust.

We think that, so far as Mrs. Nichols and this defendant, and the questions in this case are concerned, final distribution of the estate was made in 1876.

Under these circumstances we think the interest of all parties will be best subserved by advising the Superior Court to render judgment for the defendant, and for the reasons hereinbefore given we so advise that court

In this opinion LOOMIS and SEYMOUR, Js., concurred. ANDREWS, C. J., and CARPENTER, J. dissented.